David S. Casey, Jr., SBN 060768
dcasey@cglaw.com
Gayle M. Blatt, SBN 122048
gmb@cglaw.com
Jeremy Robinson, SBN 188325
jrobinson@cglaw.com
Wendy M. Behan, SBN 199214
wbehan@cglaw.com
Angela Jae Chun, SBN 248571
ajc@cglaw.com
Alyssa Williams, SBN 310987
awilliams@cglaw.com
**CASEY GERRY SCHENK
FRANCAVILLA BLATT &
PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

Attorneys for Plaintiff and the
Proposed class

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Victoria Messing and Scott Forschein, on behalf of herself and all others similarly situated, | CASE NO. |
| Plaintiff, | **CLASS ACTION COMPLAINT AND COMPLAINT FOR DAMAGES** |
| v. | **DEMAND FOR JURY TRIAL** |
| TICKETMASTER L.L.C., a Virginia corporation, LIVE NATION ENTERTAINMENT, INC., a Delaware corporation, | |
| Defendants. | |

Plaintiffs Victoria Messing and Scott Forschein ("Plaintiffs") by and

through their undersigned attorneys, brings this class action against

Ticketmaster L.L.C. ("Ticketmaster") and Live Nation Entertainment, Inc.

("Live Nation") (collectively "Defendants"), on behalf of themselves and a class of similarly situated persons (the "Class"). Plaintiff alleges the following upon her own knowledge, or where there is no personal knowledge, upon the investigation of counsel and/or upon information and belief:

1.     Ticketmaster, owned by Live Nation, is the world's largest ticket supplier with a near monopoly on major event seating in North America and the United Kingdom.

2.     In recent years, Ticketmaster has expanded into the ticket reseller arena through its "verified resale" program that lets scalpers sell directly on Ticketmaster's website.  This program gives Ticketmaster a new revenue source - a second commission on every "verified resale" ticket sold on Ticketmaster.com (on top of the commission it collects on the original purchase of each ticket).

3.     Ticketmaster developed a professional reseller program and recently created TradeDesk, a web-based inventory management system for scalpers.  TradeDesk allows scalpers to upload large quantities of tickets purchased from Ticketmaster's site and quickly list them again for resale.

4.     Ticketmaster is well aware that many of the scalpers using TradeDesk are in violation of their terms of service limiting ticket quantities per person per event.  They have in fact created an incentive to the scalpers to upload mass quantities of tickets through TradeDesk which would result in a reduction in the commission fee the scalpers pay.

5.     When scalpers are permitted to circumvent the rules set by Ticketmaster, it creates a shortage of tickets for events which then drives up ticket prices.  This behavior hurts the consumer by inflating the prices, but benefits Ticketmaster through the additional fees they earn on the resale ticket.

# THE PARTIES

6.   Defendant Ticketmaster L.L.C. is a Virginia corporation with its headquarters and principal place of business located at 9348 Civic Center Drive in Beverly Hills, California.

7.   Defendant Live Nation Entertainment, Inc. is a Delaware corporation with its headquarters and principal place of business located at 9348 Civic Center Drive in Beverly Hills, California.

8.   In 2010, Ticketmaster and Live Nation, the nation's largest concert promoter, finalized their merger.

9.   Plaintiff Victoria Messing ("Messing") is a resident of Parkland, Florida. She purchased various live event tickets through Ticketmaster's verified reseller program.

10.   Plaintiff Scott Forschein ("Forschein") is a resident of Brooklyn, New York. He purchased various live event tickets through Ticketmaster's verified reseller program.

# JURISDICTION AND VENUE

11.   Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d) because there are more than one hundred Class members, a majority of Class members are citizens of states that are diverse from Defendants and the amount in controversy exceeds $5 million, exclusive of interest and costs.

12.   This Court has personal jurisdiction over Defendants because they maintain their principal places of business in this District, are registered to conduct business in California, and have sufficient minimum contacts with California.

13.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events

or omissions giving rise to Plaintiff's and Class members' claims occurred in this District.

14.     Application of California law is proper due to the fact that Defendants' headquarters are in California, decisions given rise to the underlying facts at issue in this Complaint were presumably made in California and the misconduct emanated from California.  Additionally, Defendants' employees involved in the misconduct are presumably located at Defendants' headquarters.

## **FACTUAL ALLEGATIONS**

15.     Ticketmaster is undoubtedly the largest ticket sales and distribution company in the United States.  As of 2010, Ticketmaster is owned by Live Nation[1], the world's largest concert promoter, which brought in $10.3 billion in revenue last year.[2]

16.     In 2017, Ticketmaster earned $2.1 billion from ticket sales, up seventeen percent the prior year.[3]

17.     As Ticketmaster has a virtual monopoly on live ticket event sales in the United States, they serve as the gatekeeper to the entertainment industry's most coveted events.  In that capacity, Ticketmaster purports to maintain purchasing limits designed to prevent scalpers from using bots to buy tickets on a mass scale.

18.     By 2015, the reselling of tickets had grown to a $5 billion industry in the United States, according to CNBC.[4]  Recent investigative reporting by CBC News and Toronto Star revealed that Ticketmaster is using some

---

[1] https://www.reuters.com/article/us-ticketmaster-livenation-idUSTRE60O4E5201000126
[2] https://www.billboard.com/articles/business/8221386/live-nation-104-billion-revenue-2017-q4-earnings-drop-report
[3] *Id.*
[4] https://www.cnbc.com/2015/03/04/online-ticket-resellers-the-surreptitious-rise-of-the-online-scalper.html

dubious tactics to gain its share of the lucrative ticket resale industry.[5]

19.     According to the September 18, 2018 CBC article, data journalists monitored Ticketmaster's website for seven months leading up to a Bruno Mars concert at Scotiabank Arena, tracking seats and prices.   Reporters concluded that "Ticketmaster doesn't list every seat when a sale begins; hikes prices mid-sale; and collects fees twice on tickets scalped on its site."[6] Ticketmaster's actions results in concert-goers paying more for the initial tickets and tickets selling out faster, which then causes the consumer to purchase tickets through a resale site for more money.

20.     Ticketmaster's resale program leads to the company collecting fees multiple times on a single ticket.  For example, Ticketmaster collects $25.75 in fees on a $209.50 ticket on the initial sale.  When the same ticket is posted for resale on Ticketmaster's website for $400, the company would earn another $76 on the same ticket.[7]

21.     CBC News counted over 4,500 Bruno Mars resale tickets for the concert at Scotiabank Arena, meaning that if Ticketmaster sells every seat in the arena, it would collect an initial $250,000 in service fees, plus $308,000 in fees on scalped tickets, for a double-dipped total of $658,000.[8]

22.     The prospect of gaining the market share in the ticket resale arena, coupled with the ability to collect a second set of fees has led Ticketmaster to enter into the secondary ticket sales market.  They currently operate at least three different secondary ticket market websites, including: Ticketmaster.com/verified, Ticketexchangebyticketmaster.com, and Ticketsnow.com.

---

[5] https://www.cbc.ca/news/business/ticketmaster-prices-scalpers-bruno-mars-1.4826914
[6] *Id.*
[7] *Id.*
[8] *Id.*

23.     To aid resellers list tickets, originally purchased through Ticketmaster, on their website for resale, Ticketmaster launched a professional reseller program called TradeDesk.  TradeDesk is a web-based inventory management system that allows resellers to upload large quantities of tickets purchased from Ticketmaster's website and quickly list them again for resale on Ticketmaster. The company claims this program is "the most powerful ticket sales tool. Ever."[9]

24.     For years, Ticketmaster has publicly denounced scalpers.  Less than a decade ago, then-CEO Irving Azoff testified before Congress stating, "I believe that scalping and resales should be illegal."[10]  Based on Ticketmaster's current courting of scalpers with their TradeDesk program, they have made a clear divergence from their prior position.

25.     One of the reasons for this change within Ticketmaster is likely due to the fact that they found a way to collect a second set of fees on the same ticket through the resale of a ticket originally purchased through Ticketmaster and then resold through their "verified resale" program.

26.     A September 19th article details how CBC News and the Toronto Star in July 2018, sent reporters undercover to Ticket Summit 2018 in Las Vegas, a ticketing and live entertainment convention. Posing as scalpers and equipped with hidden cameras, the journalists were pitched on Ticketmaster's professional reseller program.[11]

27.     Casey Klein, Ticketmaster Resale Director, held a session closed to the media called, "We appreciate your partnership: More brokers are listing with Ticketmaster than ever before."[12]

---

[9] https://www.cbc.ca.news/business/a-public-relations-nightmare-ticketmaster-recruits-pros-for-secret-scalper-program-1.4828535
[10] *Id.*
[11] *Id.*
[12] *Id.*

28.     Ticketmaster representatives told the undercover reporters that Ticketmaster's resale division turns a blind eye to scalpers who use ticket-buying bots and fake identities to purchase tickets and resell them on the site for inflated prices, which means extra fees for Ticketmaster.  One sales representative said, "I have brokers that have literally a couple of hundred accounts. It's not something that we look at or report."  Another presenter said that Ticketmaster's resale division isn't interested in whether clients use automated software and fake identities to bypass the box office's ticket buying limits.  "If you want to get a good show and the ticket limit is six or eight…you're not going to make a living on six or eight tickets."[13]

29.     Ticketmaster's own official reseller handbook specifies the company's reward incentive program for scalpers.  When the scalpers reach $500,000 in sales, they receive a one percent reduction in fees and another percentage is discounted once they hit $1 million.  By using TradeDesk, scalpers automatically get a three percent discount from the usual seven percent selling fee per resale ticket.[14]

30.     In March, the reporters learned from a Ticketmaster employee that there were approximately 100 scalpers in North America using TradeDesk to sell between a few thousand and several million tickets per year.  The employee stated, "I think our biggest broker right now has probably grabbed around five million."[15]

31.     Ticketmaster is ignoring this flagrant abuse of their terms of use.  They are well-aware that the scalpers are using technology to circumvent the transaction ticket limit.  When asked about the usage of bots to buy their tickets, a Ticketmaster employee stated, "We don't share reports, we don't

[13] *Id.*
[14] *Id.*
[15] *Id.*

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES

share names, we don't share account information with the primary site. Period." He continued to state, "We've spent millions of dollars on this tool. The last thing we'd want to do is get brokers caught up to where they can't sell inventory with us."[16]

32.     Publicly, Ticketmaster has distanced itself from TradeDesk. Neither TradeDesk or the professional reseller program are mentioned anywhere on Ticketmaster's website or corporate reports.  In order to gain access to TradeDesk's website, one must first email a registration request.

33.     On September 21st, in response to the CBC News report, United States Senators Jerry Moran and Richard Blumenthal, chairman and ranking member of the U.S. Senate Commerce Subcommittee on Consumer Protection Product Safety, Insurance and Data Security, has initiated an inquiry to Live Nation questioning its practices in both the primary ticketing platform and resale marketplace and whether its practices are in the best interests of consumers.[17]

34.     The Senators are concerned that this conduct by Defendants harms consumers and violates the Better Online Ticket Sales (BOTS) Act of 2016 which prohibits the "circumvention of a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or maintain the integrity of posted online ticket purchasing order rule."[18]

35.     The BOTS Act also prohibits Ticketmaster from selling tickets where they "knew or should have known that the event ticket was acquired in

---

[16] *Id.*

[17] https://www.moran.senate.gov/public/index.cfm/news-releases?ID=4DC8F704-7DCA-49ED-BA-70-F9506DF7B22C

[18] *Id.*

violation of subparagraph (A)."

36.     Ticketmaster's President, Jared Smith, responded to the Senators' letter on October 5th.  He writes that "Ticketmaster does not have, and has never had, any product or program that allows ticket scalpers, or anyone else, to buy tickets ahead of fans and circumvent the policies we have on our site regarding on-line ticket purchasing limits."[19]

37.     Ticketmaster's response mischaracterizes the inquiries, as the TradeDesk program is not alleged to allow scalpers earlier access to tickets or allow them to circumvent the ticket purchasing limits.  Rather, the incentive of collecting double commission fees on resale tickets has caused Ticketmaster to turn a blind eye from these resellers flagrantly violating the terms of use ticket limits.  By permitting the BOTS Act violations of others on their website and then serving as a broker to sell those tickets back to the consumer, Ticketmaster is clearly in violation of the law.

38.     In an interview with Billboard Magazine published on September 24th, Mr. Smith acknowledged, "there's clearly some things that we're not doing well enough.  We'll learn from it and we'll make some changes….We probably don't do enough to look into TradeDesk."[20]  Mr. Smith did not explain though why Ticketmaster built into TradeDesk a feature that allows resellers to synchronize multiple Ticketmaster accounts for quick and efficient resale in the secondary marketplace.[21]  Multiple Ticketmaster accounts to circumvent the ticket limit imposed per event is in clear violation of their Terms of Use.[22]

39.     The outrage over Ticketmaster's conduct has spilled over to music

---

[19] https://www.billboard.com/articles/business/8478525/ticketmaster-responds-senate-letter
[20] https://www.billboard.com/articles/business/8476697/ticketmaster-president-tradedesk-scandal-exclusive-interview
[21] https://thestar.com/news/investigations/2018/09/25/ticketmasters-tradesk-scalper-tool-explained.html
[22] https://www.ticketmaster.com/h/terms.html

industry professionals, such as band managers. On October 18th, CBC published leaked emails from managers of popular musical acts to Ticketmaster blasting them for the secretive partnership with scalpers and demanding answers.[23] Paul Crockford, manager of former Dire Straits frontman Mark Knopfler, said, "It was always hidden in the shadows a bit and nobody really knew. Whenever you asked you were always told that they didn't have any relationship with power brokers or resellers or scalpers."[24] He told CBC that "he feels deceived by Ticketmaster and believes that by helping scalpers to resell tickets, the box office strips artists of their ability to set prices for fans."[25] Richard Jones, manager of the Pixies and Teenage Fanclub said, "They are a conflicted company…The more the ticket is, the more they earn from the fees. So if a ticket is sold once, two times, three times at inflated prices, they get a greater percentage for each ticket."[26] That is why the managers were appealing to Ticketmaster to stop facilitating the resale of tickets, which inevitably drives up prices for fans. Mumford & Sons and Radiohead have both recently insisted that Ticketmaster not allow resale tickets for their shows on their website.

40.    As the gatekeeper to almost all of this country's live performances, Ticketmaster has an obligation to deter scalping activity and instead they are encouraging it for their own monetary benefit. As a result, Plaintiff and the Class suffer by paying too much for ticket prices.

41.    To the extent that Ticketmaster asserts that any waiver of class action claims and/or enforcement of arbitration clause(s) are applicable to the allegations contained in this Complaint, Plaintiffs' contend that such

---

[23] https://cbc.ca/news/business/ticketmaster-scalper-program-band-managers-1.4867652
[24] *Id.*
[25] *Id.*
[26] *Id.*

provisions should not be enforceable upon Plaintiffs' as a result of Ticketmaster's non-compliance with its own Terms of Use and/or void as against public policy as a result of Ticketmaster's fraudulent and/or deceptive business practices to the detriment of consumers.

## CLASS ACTION ALLEGATIONS

42.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), or (c)(4) individually and on behalf of the members of the following proposed classes:

### A. The Nationwide Class

43.    Plaintiffs seek to represent a proposed nationwide class (the "Nationwide Class"), defined as follows:

> All persons in the United States who purchased a verified resale ticket from a professional reseller using Ticketmaster's resale partner program and/or TradeDesk.

### B. The Florida Subclass

44.    Plaintiff Messing also seeks to represent a subclass comprised of Florida residents (the "Florida Subclass"), defined as:

> All persons in the State of Florida who purchased a verified resale ticket from a professional reseller using Ticketmaster's resale partner program and/or TradeDesk.

### C. The New York Subclass

45.    Plaintiff Forschein also seeks to represent a subclass comprised of New York residents (the "New York Subclass"), defined as:

> All persons in the State of New York who purchased a verified resale ticket from a professional reseller using Ticketmaster's resale partner program and/or TradeDesk.

46.    Except where otherwise noted, "the Class" and "Class members" shall refer to members of the Nationwide Class and the state Subclasses,

collectively.

47.     Excluded from the Class are Ticketmaster and Live Nation, its subsidiaries, affiliates, officers, directors, and employees; persons who have settled with and validly released Defendants from separate, non-class legal actions against Defendants based on the conduct alleged herein; counsel, and the immediate families of counsel who represent Plaintiffs in this action; the judge presiding over this action; and jurors who are impaneled to render a verdict on the claims alleged in this action.

48.     Plaintiffs are informed and believe that the proposed Class comprises millions of members.  The Class is, therefore, so numerous and geographically dispersed that joinder of all members in one action is impracticable.

49.     Defendants have acted, with respect to Plaintiffs and members of the proposed Class, in a manner generally applicable to each of them.  There is a well-defined community interest in the questions of law and fact involved, which affect all Class members.  The questions of law and fact common to the Class predominate over the questions that may affect individual Class members, including the following:

    a.    Whether Defendants permitted scalpers to violate their terms of service by purchasing tickets in excess of the stated limit in order to encourage them to sell those same tickets through Ticketmaster's verified resale partner program;

    b.    Whether Defendants violated the Better Online Ticket Sales Act of 2016 ("BOTS Act of 2016");

    c.    Whether Defendants violated the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code sections 17200-17209;

    d.    Whether Defendants violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat § 501.201 *et seq.* ("FDUTPA");

e.      Whether Defendants violated the N.Y. Gen. Bus. Law §§ 349 *et seq.* ("NYGBL");

f.      Whether Defendants have been unjustly enriched as a result of its fraudulent conduct;

g.      Whether Plaintiffs' claims satisfy the criteria for class certification under Federal Rule of Civil Procedure 23 and, to the extent applicable, California Civil Code section 1781;

h.      Whether compensatory or consequential damages should be awarded to Plaintiffs and members of the proposed Class;

i.      Whether punitive damages should be awarded to Plaintiffs and members of the proposed Class;

j.      Whether other, additional relief is appropriate, and what that relief should be.

50.     Plaintiffs' claims are typical of the claims of all members of the Class she proposes to represent in this action.

51.     Plaintiffs will fairly and adequately represent and protect the interests of the Class and does not have interests that are antagonistic to, or in conflict with, those she seeks to represent.

52.     Plaintiffs have retained counsel who have extensive experience in the prosecution of class actions and other forms of complex litigation.

53.     In view of the complexity of the issues and the expense that an individual plaintiff would incur if he or she attempted to obtain relief from a large, transnational corporation such as Ticketmaster and Live Nation, the separate claims of individual Class members are monetarily insufficient to support separate actions.  Because of the size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of in this Complaint.

54.     The Class is readily definable, and prosecution as a class action

will eliminate the possibility of repetitious litigation and will provide redress for claims too small to support the expense of individual, complex litigation. Absent a class action, Class members will continue to suffer losses, Defendants' violations of law will be allowed to proceed without a full, fair, judicially supervised remedy, and Defendants will retain sums received because of their wrongdoing.  A class action will provide a fair and efficient method for adjudicating this controversy.

55.     The prosecution of separate claims by individual Class members would create a risk of inconsistent or varying adjudications with respect to thousands of individual Class members, which would, as a practical matter, dispose of the interests of the Class members not parties to those separate actions or would substantially impair or impede their ability to protect their interests and enforce their rights.

56.     The conduct of Defendants is generally applicable to the Class, as a whole, and Plaintiffs seek equitable remedies with respect to the Class as a whole.  As such, the policies and practices of Defendants make declaratory or equitable relief with respect to the Class appropriate.  Fed. R. Civ. P. 23(b)(2).

## FIRST CAUSE OF ACTION

**Unlawful, Fraudulent, and Unfair Business Practices in Violation of the Unfair Competition Law ("UCL") Cal. Bus. Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiffs and the Nationwide Class)**

57.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

58.     The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

59.     During the relevant time period, Defendants violated the UCL's proscription against engaging in unlawful conduct by virtue of its fraudulent and deceitful conduct in violation of the Better Online Ticket Sales (BOTS) Act

of 2016, 15 U.S.C.A. § 45c.

60.     During the relevant time period, Defendants violated the UCL's proscription against fraud as a result of engaging in fraudulent and deceitful conduct alleged herein.

61.     During the relevant time period, Defendants violated the UCL's proscription against unfair conduct as a result of engaging in the conduct alleged in this Complaint, which violates legislatively-declared policies articulated in 15 U.S.C.A. § 45c.

62.     The acts and practices of Defendants, as set forth in this Complaint, show a violation of the BOTS Act.  The BOTS Act states in subsection (a)(1) that it shall be unlawful for any person:

> (A)     To circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules; or
>
> (B) To sell or offer to sell any event ticket in interstate commerce obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either -
>
>> i.  Participated directly in or had the ability to control the conduct in violation of subparagraph (A); or
>>
>> ii.  Knew or should have known that the event ticket was acquired in violation of subparagraph (A).

63.     The BOTS Act states in subsection (b) "A violation of subsection (a) shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57(a)(1)(B)).  Therefore, Defendants' actions also violate the unfair prong of Cal. Bus. & Prof. Code § 17200.

64.   Defendants' violations of the UCL continue to this day.  As a direct and proximate result of Defendants' violations of the UCL, Plaintiff and Class members have suffered actual damage in that they paid more for tickets and double fees.

65.   Pursuant to Section 17203 of the UCL, Plaintiffs and the Class seek an order that requires Defendants (a) to enforce their terms of use by limiting ticket quantities to all customers, including participants in their verified resale partner program; (b) to make full restitution of all moneys wrongfully obtained from its violations of the UCL, as alleged in this Complaint; and (c) requires Defendants to pay the attorney fees and costs incurred by counsel for Plaintiffs and the proposed Class in accordance with California Code of Civil Procedure section 1021.5.

## SECOND CAUSE OF ACTION

### Violation of Florida Deceptive and Unfair Trade Practices Act

### Fla. Stat § 501.201, *et seq.*

### (On Behalf of Plaintiff Messing and the Florida Subclass)

66.   Plaintiff Messing realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

67.   At all relevant times, Plaintiff and Florida Subclass members were "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat § 501.201 *et seq.* ("FDUTPA").

68.   Ticketmaster is engaged in trade and commerce in Florida.

69.   FDUPTA declares that "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.

70.   During the relevant time period, Defendants violated FDUPTA's proscription against engaging in unlawful conduct by virtue of its fraudulent and deceitful conduct in violation of the Better Online Ticket Sales (BOTS) Act

of 2016, 15 U.S.C.A. § 45c.

71.     During the relevant time period, Defendants violated the FDUPTA's proscription against unfair conduct as a result of engaging in the conduct alleged in this Complaint, which violates legislatively-declared policies articulated in 15 U.S.C.A. § 45c.

72.     The acts and practices of Defendants, as set forth in this Complaint, show a violation of the BOTS Act.  The BOTS Act states in subsection (a)(1) that it shall be unlawful for any person:

(C) To circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules; or

(D)     To sell or offer to sell any event ticket in interstate commerce obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either -

i.  Participated directly in or had the ability to control the conduct in violation of subparagraph (A); or

ii.  Knew or should have known that the event ticket was acquired in violation of subparagraph (A).

73.     The BOTS Act states in subsection (b) "A violation of subsection (a) shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57(a)(1)(B)).

74.     Defendants knew or should have known that their actions detailed in the complaint were in violation of the BOTS Act.

75.     Defendants' violations of FDUPTA continue to this day.  As a direct and proximate result of Defendants' violations of the FDUPTA, Plaintiff

and Class members have suffered actual damage in that they paid more for tickets and double fees. Plaintiff and the Florida Subclass seek actual damages under Fla. Stat. § 501.211(2).

76.     As a direct result of Defendants' knowing violation of FDUTPA, Plaintiff and the Florida Subclass are entitled to damages as well as injunctive relief and seek an order that requires Defendants (a) to enforce their terms of use by limiting ticket quantities to all customers, including participants in their verified resale partner program; and (b) requires Defendants to pay the attorney fees and costs incurred by counsel for Plaintiff and the proposed Class in accordance with Fla. Stat. §§ 501.2105 and 501.211.

### THIRD CAUSE OF ACTION

### Violation of N.Y. Gen. Bus. Law §§ 349 *et seq.*

### (On Behalf of Plaintiff Forschein and the New York Subclass)

77.     Plaintiff Forschein realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

78.     New York General Business Law ("NYGBL") §§ 349, *et seq.* prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

79.     By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of the NYGBL § 349. The conduct alleged herein is a "business practice" within the meaning of the NYGBL § 349.

80.     Ticketmaster acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff and the New York Subclass members' rights.

81.     During the relevant time period, Defendants violated NYGBL's proscription against engaging in unlawful conduct by virtue of its fraudulent and deceitful conduct in violation of the Better Online Ticket Sales (BOTS) Act

of 2016, 15 U.S.C.A. § 45c.

82.     During the relevant time period, Defendants violated the NYGBL's proscription against unfair conduct as a result of engaging in the conduct alleged in this Complaint, which violates legislatively-declared policies articulated in 15 U.S.C.A. § 45c.

83.     The acts and practices of Defendants, as set forth in this Complaint, show a violation of the BOTS Act.  The BOTS Act states in subsection (a)(1) that it shall be unlawful for any person:

> (E) To circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules; or
>
> (F) To sell or offer to sell any event ticket in interstate commerce obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either -
>
> > i.  Participated directly in or had the ability to control the conduct in violation of subparagraph (A); or
> >
> > ii. Knew or should have known that the event ticket was acquired in violation of subparagraph (A).

84.     The BOTS Act states in subsection (b) "A violation of subsection (a) shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57(a)(1)(B)).

85.     Defendants knew or should have known that their actions detailed in the complaint were in violation of the BOTS Act.

86.     Defendants' violations of NYGBL continue to this day.  As a direct and proximate result of Defendants' violations of the NYGBL, Plaintiff and

Class members have suffered actual damage in that they paid more for tickets and double fees.

87.    Defendants' deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including New Yorkers who purchased tickets from Ticketmaster on their secondary market.

88.    The above deceptive and unlawful practices and acts by Defendants caused substantial injury to Plaintiff and New York Subclass members that they could not reasonably avoid.

89.    Plaintiff and New York Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

<u>**FOURTH CAUSE OF ACTION**</u>

**Unjust Enrichment**

**(On Behalf of Plaintiffs and the Nationwide Class)**

90.    Plaintiffs realleges and incorporates by reference each and every paragraph above as though fully set forth herein.

91.    As a direct, proximate, and foreseeable result of Defendants' acts and otherwise wrongful conduct, Plaintiffs and Class members suffered damages.  Defendants profited and benefitted from the fact that Plaintiffs to pay higher ticket prices and fees.

92.    Defendants have voluntarily accepted and retained these profits and benefits, derived from their customers, including Plaintiffs and Class members, with full knowledge and awareness that retention of such profits and benefits is wrong and unlawful.

93.    By virtue of the conscious wrongdoing alleged in this Complaint, Defendants have been unjustly enriched at the expense of Plaintiffs and Class

members, who are entitled to, and hereby seek, the disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, to the extent and in the amount, deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

94.     Unless successful on the preceding counts of this Complaint, Plaintiffs and the Class have no adequate remedy at law.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, respectfully requests that this Court enter an order:

1.      Certifying the proposed Class and  Subclasses, and appointing Plaintiffs as Class Representatives;

2.      Finding that Defendants' conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

3.      Enjoining Defendants from engaging in further negligent, deceptive, unfair, and unlawful business practices as alleged herein;

4.      Awarding Plaintiffs and Class members actual, compensatory, and consequential damages;

5.      Awarding Plaintiffs and Class members statutory damages and penalties, as allowed by law;

6.      Awarding Plaintiffs and Class members restitution and disgorgement;

7.      Awarding Plaintiffs and Class members pre-judgment and post-judgment interest;

8.      Awarding Plaintiffs and Class members reasonable attorneys' fees, costs, and expenses; and

9.      Granting such other relief as the Court deems just and proper.

# **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the proposed Class, hereby demand a trial by jury as to all matters so triable.

Dated: November 2, 2018

CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD, LLP

By:   /s/ Gayle M. Blatt
GAYLE M. BLATT
*gmb@cglaw.com*

Attorneys for Plaintiff

Patrice L. Bishop
**STULL, STULL & BRODY**
9430 West Olympic Blvd., Suite 400
Beverly Hills, CA  90212
Tel:    (310) 209-2468
Fax:    (310) 209-2087
Email: service@ssbla.com

Melissa R. Emert
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY  10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022
Email:  memert@ssbny.com

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES